**SO ORDERED.**

**SIGNED this 21st day of November, 2013.**



*Dale L. Somers*
United States Bankruptcy Judge

___

Opinion designated for online use, but not print publication
# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **In Re:** | |
| **IZABEL HODGSON,** | **CASE NO. 12-22753** |
| DEBTOR. | **CHAPTER 7** |
| **BOKARA RUG COMPANY, INC.,** | |
| PLAINTIFF, | |
| v. | **ADV. NO. 13-06004** |
| **IZABEL HODGSON,** | |
| DEFENDANT. | |

### MEMORANDUM OPINION AND ORDER
### GRANTING OBJECTION TO DISCHARGE OF DEBT OWED TO
### BOKARA RUG COMPANY, INC.

In this adversary proceeding, Plaintiff Bokara Rug Company, Inc. (Bokara) contends that its claim against Debtor should be excepted from discharge under 11 U.S.C. § 523(a)(2)(A).[1]  Trial was held on September 24, 2013.  Bokara appeared by Thomas Ruzicka of Hubbard, Ruzicka, Kreamer & Kincaid, LLC.  Debtor appeared in person and by Jeff Wagoner of Wagoner, Maxcy, Westbrook PC.  The parties stipulated to the admission of all offered exhibits.  For the reasons discussed below, the Court sustains the Complaint.

**FINDINGS OF FACT.**

Prepetition Debtor Izabel Hodgson, in addition to her employment at Sprint, conducted business as Izabel Oriental Rugs.  She sold primarily to interior designers in the Kansas City area.  From 2001 through at least May 2008, Bokara, a New York corporation with offices in Secaucus, New Jersey, was Debtor's primary rug supplier.  A Consignment Agreement dated May 11, 2001, between Debtor d/b/a Izabel Oriental Rugs, as consignee, and Bokara, as consignor, governed their relationship.  Rugs were shipped to Debtor in consignment lots on a sale or return basis.  The rugs remained the property of Bokara.  There was no predetermined period of time in which the consigned rugs were required to be sold or returned.  For all rugs sold, Debtor was to remit to

---

[1] This Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b), and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984.  Furthermore, this Court may hear and finally adjudicate this matter because it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H).  There is no objection to venue or jurisdiction over the parties.

2

Bokara the invoice price stated on the consignment document. Bokara retained the option to invoice for all rugs not returned. This occurred sometime, perhaps several years, after the shipment.

The Consignment Agreement included the following provisions regarding records and payment for rugs sold:

> 5. Consignee agrees to keep accurate records showing the Goods on consignment under this Agreement and the consigned price, sales price to customers (including consigned sales) setting forth the names, addresses, quantities purchased and terms of sale and the consigned goods remaining on hand with Consignee and any Goods returned for whatsoever reason to Consignor. Consignee agrees that Consignor or its authorized representative shall have access to the consigned Goods and to the records described herein with respect thereto during the term of this Agreement, for the purpose of inspection.
>
> 6. Consignee agrees, that within not later than the tenth (10th) day of the month following each month in which consigned Goods are sold by Consignee, to provide to Consignor an accurate detailed account of all sale of consigned Goods under this Agreement for the prior calendar month in which sales in fact occur. At such time Consignee shall remit to Consignor the Invoice Price thereof.

Debtor testified that she kept records of the consignments in her book (which was not produced or consulted at trial), but she was unable to identify the Bokara rugs in her possession. In response to questions involving such facts, she stated that Bokara should have the required information. Also, Debtor testified that she sent money to Bokara when it was available, not that she sent money within 10 days following the month of a sale, as

3

required by the Consignment Agreement. While Bokara and Debtor had an ongoing business relationship, Bokara never attempted to examine the rugs in Debtor's possession.

The Consignment Agreement required Debtor to insure the consigned rugs. It provides:

> 7. Consignee shall keep the Goods described herein insured at no less than the invoiced price against damage, destruction and loss of an kind and all kind while in the possession, care, custody or control . . . of Consignee or is customer(s) until payment to Consignor and shall cause the insurance proceeds on any loss or losses of such consigned Goods to be paid to Consignor provided however, Consignor shall be entitled to receive any insurance proceeds in excess of the Invoice price, in the same manner that Consignee shall be entitled to retain any proceeds from sale in excess of that amount. Consignee shall furnish Consignor with a Certificate of Insurance (Certificate ) listing Consignor as an insured as its interest may appear. Such Certificate shall provide that coverage shall not be canceled without thirty (30 ) days prior written notice to Consignor.

Debtor and Bokara also entered into a security agreement granting Bokara a security interest in all rugs or other property shipped to Debtor by Bokara. It provided that Debtor would "Keep the Collateral insured against loss by fire, theft, and other casualties" and give immediate written notice to Bokara and the insurers of any loss to the collateral. Debtor personally guaranteed her obligation to Bokara.

The exhibits reveal that Bokara had problems in collecting amounts owed by Debtor as early as 2006.[2] On October 17, 2008, Bokara sent a notice of delinquent

---

[2] Dkt. 13-4, 32.

4

account, and on December 4, 2008, counsel for Bokara sent a letter to Debtor demanding payment of $129,108.98 for goods sold and delivered.[3] Payment was not made, and suit was filed by Bokara against Debtor and Izabel's Oriental Rugs in the Supreme Court of the State of New York, County of New York on or about July 8, 2009, seeking to recover $107,946.00, the balance remaining after all credits.[4]

Bokara alleges that Debtor as of October 10, 2012, the date of filing her Chapter 7 case, owed $64,461.27, and Debtor has stipulated to the existence of the claim and the amount. The forgoing claim reflects the amount stated on the Customer Statement (Open Document) dated April 12, 2013, which contains invoice and credit entries commencing on August 31, 2009.[5] It reflects charges related to 17 consignment shipments during 2007, the first of which was on April 11, 2007, two shipments in 2008, one on January 22 and one on June 13. As stated above, in October 2008, Bokara made demand on Debtor for payment of $129,108.98, and suit was filed in July 2009. In September 2009, Debtor traveled to New Jersey and met with Bokara representatives. They agreed to payment terms of $5,000 per month, and that Bokara would resume consignment shipments. New shipments were made on September 25 and September 30, 2009. Bokara also agreed not

---

[3] Debtor's Statement of Financial Affairs and schedules indicate a judgment against her by Bokara in the State of New Jersey, Case No. HUD-L-6041-11 for $64,461.27, but there was no trial evidence in this regard.

[4] Exh. E. The trial exhibits and testimony were generally limited to transactions stated on the Customer Statement dated April 12, 2013 stating a balance due of $64,461.27 and did not explain the computation or origin of the amount sought in the New York litigation.

[5] Exh. 4.

5

to pursue the litigation. Debtor failed to make timely payments. Bokara terminated consignment shipments, and all future sales to Debtor were made on a COD basis. Between January 14, 2010 and June 28, 2011, the Customer Statement reflects five cash payments by Debtor totaling $22,000, which Bokara credited to the outstanding balance which was the subject of the agreement to pay $5,000 per month. The Customer Statement reflects credit for seven rug returns - six for consignments before June 2008 and one for the June 13, 2008 consignment. Debtor testified that she thought she sold all of the rugs from the last three consignments, but Bokara's records show an outstanding balance owed of $24,406.43 for these shipments, which amount is included in the $64,461.27 claim.

Debtor operated her rug business out of her home, storing rugs in her basement and garage. On May 2, 2008, Debtor's home was destroyed by fire.[6] The balance owed on consignments prior to the May 2, 2008 fire is $40,054.84[7]. According to Debtor, the fire, smoke, and water damaged 90% of her inventory, which was not salvageable. But Debtor offered no records as to which of the Bokara rugs she had in her possession at the time of the fire or the extent of damage to them. Debtor testified that rugs in the garage were destroyed and those in the basement were in several inches of water; that any rugs shipped by Bokara before the fire which had not been sold or placed by her on

---

[6] The origin of the fire was electrical.

[7] This amount is the difference between $64,461.27, the stipulated total claim, and $24,406.43, the amount owed on the post-fire consignment shipments.

Case 13-06004   Doc# 32   Filed 11/21/13   Page 6 of 19

consignment to third parties were destroyed.[8]  Debtor denied having sold any rugs which were in the house at the time of the fire.  She stated that rugs were placed in dumpsters and some were given to workmen.  The six rugs which were returned to Bokara after the fire had been placed by Debtor on consignment with decorators and furniture stores, so they were not in the house at the time of the fire.

The rugs at Debtor's home at the time of the fire were not insured.[9]  When asked by Bokara's counsel, Debtor acknowledged that the Consignment Agreement and the Security Agreement required the purchase of insurance and that she never had purchased the required insurance.  Debtor testified that she did not remember "the insure part" of the Consignment Agreement and stated, "I guess I signed it.  But I never thought I will have a fire to lose it completely, so I just - - okay."[10]  Bokara's counsel responded, "So if you never thought that you would ever have a fire, was there ever any intention on you getting an insurance policy?"[11]  Debtor answered, "I guess not."[12]  Later in her testimony, Debtor answered "right" to the statement that "you didn't really have any intention of ever entering into those insurance agreements as you represented to Bokara."[13]  On cross

---

[8] But Debtor also testified that presently there were three damaged Bokara rugs in her garage.

[9] Debtor's homeowner's insurance had a $200 limit on business property.

[10] Tr. 9, 6-8.

[11] Tr. 9, 9-11.

[12] Tr. 9, 12.

[13] Tr. 11, 16-19.

7

examination by her own counsel, Debtor testified that she "wanted to get insurance but it was too expensive,"[14] that she was not "lying" to Bokara.[15]

Mr. Jan Soleimani, the president and owner of Bokara, testified that Bokara did not know until very "recently" that Debtor operated her business out of her home and that Bokara rugs were destroyed or damaged by fire on May 2, 2008. Debtor's testimony to the contrary is not credible. If Debtor told Bokara of the fire, as she testified, the message conveyed was that she lost her home, not the Bokara rugs. All of Bokara's actions to collect its debt are consistent with its lack of knowledge of where Debtor stored her inventory and particularly with the destruction of that inventory by fire. In 2009 an employee of Bokara was in the Kansas City area and attempted to make arrangement to inspect Debtor's inventory, but was unsuccessful. Bokara's lack of notice of the fire and the inventory destruction had significant consequences. Bokara was deprived of the opportunity to inspect the rugs and determine salvageability. Mr. Soleimani testified that Bokara would not have made the consignment shipment to Debtor on June 13, 2008, about a month after the fire, or made the two shipments in September 2009 after Debtor's visit to New Jersey, which shipments had a total invoice price of $24,406.43, if it had known that the previously shipped inventory had been destroyed, since the damage to the inventory evidenced Debtor's lack of ability to pay her debt to Bokara and remain in

---

[14] Tr. 50, 20-22.

[15] Tr. 51, 1.

Case 13-06004   Doc# 32   Filed 11/21/13   Page 8 of 19

business.  Also, Mr. Soleimani testified that lack of notice of the loss deprived him of the opportunity to make a claim on Bokara's $10 million insurance policy.

Bokara is not convinced that all of the Bokara rugs were irreparably damaged in the fire.  Mr. Soleimani, who does insurance claim adjusting, testified that rugs sustaining water damage could be salvaged.  After the fire, ServiceMaster extracted water from 656 square feet of rugs, which Debtor testified were some of the rugs that had been in the basement.  ServiceMaster removed the rugs from the premises.  According to Debtor, she later picked up these rugs and put them in a storage unit until she moved into her house. Debtor did not testify how many rugs were treated by ServiceMaster or their ultimate disposition.

Bokara also provided bank statements and income tax returns showing that after the May 2, 2008 fire, Debtor's rug business had revenues of $150,644.29 in 2008, $217,725.28 in 2009, $120,123.13 in 2010, $62,818.48 in 2011, $34,569.00 in 2012, and $7,581 through May 2013, for at total of $593,461.18.[16]  Debtor did not dispute the revenue figures, but she had no explanation of the source of that income. Debtor testified that she sold very few rugs out of her home after the fire because she had no inventory. The only source of post-fire rugs she identified were those sent to her by Bokara, which were three consignments with invoice values totaling $24,406.43 and COD shipments of

---

[16] Exh. 9 & 10.

9

no more than $30,000 to $40,000. She denied that any Bokara rugs stored at her home on May 2, 2008 were sold.

**DISCUSSION.**

   **I. Construction of Section 523(a)(2)(A) of the Bankruptcy Code.**

Section 523(a)(2)(A) of the Bankruptcy Code[17] provides:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt -
> . . .
> (2) for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by -
>   (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

To establish that a claim is excepted from discharge for false representation under this subsection, the creditor must prove the following by a preponderance of the evidence: "The debtor made a false representation; the debtor made the representation with the intent to deceive the creditor; the creditor relied on the representation; the creditor's reliance was [justifiable]; and the debtor's representation caused the creditor to sustain a loss."[18] Discharge may also be denied based upon false pretenses ("implied misrepresentations intended to create and foster a false impression"[19]) or actual fraud ("when a debtor intentionally engages in a scheme to deprive or cheat another of property

---

[17] 11 U.S.C. § 523(a)(2)(A). Future references to Title 11 in the text shall be to the section only.

[18] *Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).

[19] *Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 223 (10th Cir. BAP 2013).

10

or a legal right"[20]). The Tenth Circuit has held that if there is a duty to disclose, failure to do so constitutes a "false misrepresentation" or "false pretenses" under § 523(a)(2)(A).[21] The Tenth Circuit BAP, further refining the concepts, has observed that "[u]nlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions."[22] A debtor's intent to deceive the creditor when making the false representations need not be proven directly; it may be inferred from the totality of the circumstances or from a knowingly false statement.[23] The creditor seeking to except its claim from discharge has the burden to prove its case by a preponderance of the evidence.[24]

### II. Plaintiff's theories.

In its closing argument, Plaintiff presented three alternative theories of fraud or misrepresentation for purposes of § 523(a)(2)(A). The first is premised upon Debtor's contention that all rugs consigned to Debtor by Bokara before the May 2, 2008 fire and in her possession on the date of the fire, with the exception of those rugs re-consigned by Debtor to local businesses and later returned to Bokara, were destroyed in the fire. Bokara alleges that Debtor's failure to insure the consigned rugs as required in the

---

[20] *Id.*

[21] *In re Young*, 91 F.3d at 1374.

[22] *In re Sturgeon*, 496 B.R. at 223.

[23] *In re Young*, 91 F.3d at 1375.

[24] *Id.*, 91 F.3d at 1373.

11

Consignment Agreement and the security agreement was a false representation or a false pretense which caused its loss. The second theory is that fewer than all of the Bokara rugs consigned to Debtor before the fire and in her possession on the date of the fire were destroyed in the fire and that Debtor fraudulently sold the salvageable rugs and failed to account to Bokara for the sale proceeds. The third theory is that Bokara's claim is nondischargeable because Debtor fraudulently concealed the fact that Bokara rugs were damaged and destroyed in the fire and the concealment caused loss to Bokara. The Court will examine these alternatives and the related additional elements required for exception from discharge.

**III. Bokara's claim is not excepted from discharge based on the theory that Debtor's failure to insure the consigned rugs was a false representation or false pretense.**

The Court finds Bokara's first theory of recovery, fraudulent failure to purchase insurance, insufficient for denial of discharge. The Consignment Agreement and the Security Agreement both required Debtor to insure the consigned rugs. The rugs were not insured. As stated in the Findings of Fact, Debtor testified that she didn't remember the "insure part" of the Consignment Agreement, but "I guess I signed it. But I never thought I will have a fire to lose it completely, so I just – okay." Bokara's counsel responded, "so if you never thought that you would ever have a fire, was there ever any intention on you getting an insurance policy?" Debtor answered, "I guess not."[25] Later

---

[25] Tr. 9, 4-12.

12

Debtor answered "right" to the statement by Bokara's counsel that "you didn't really have any intention of ever entering into those insurance agreements as you represented to Bokara."[26] On cross examination by her own counsel, Debtor testified that she "wanted to get insurance but it was too expensive," but she was not "lying" to Bokara.[27] The Court finds Debtor's response to questioning by Bokara's counsel creditable and not rebutted by her testimony on cross-examination by her own counsel.

The Court finds that Debtor's failure to obtain insurance was a false pretense for purposes of § 523 (a)(2)(A). It was conduct that falsely led Bokara to believe that the rugs were insured. Debtor's testimony also establishes that the false pretense was intentional. Debtor knew when she entered into the Consignment Agreement that she did not have and would not purchase the required insurance but nevertheless accepted rugs on consignment. Bokara when shipping rugs to Debtor on consignment relied upon the false pretense.

But Bokara has not proven that its reliance was reasonable. The Consignment Agreement provided Debtor would furnish Bokara with a Certificate of Insurance, which she did not do. Bokara never requested the certificate but merely assumed the insurance had been obtained. In general, Bokara and Debtor did not abide by the operational provisions of the Consignment Agreement. It appears that Debtor did not maintain the records required or promptly forward the price of a rug after sale to a customer. It was

---

[26] Tr. 11, l6-19.

[27] Tr. 50, 2l-22 and Tr. 51, 1.

not reasonable for Bokara to assume Debtor purchased insurance as required by the documentation when it did not request the certificate of insurance or generally require strict adherence to the operational terms of the Consignment Agreement.

**IV. Bokara's claim is not excepted from discharge based upon the theory that rugs consigned to Debtor before the fire were sold by her after the fire.**

The Court finds Bokara's second theory of recovery, fraudulent sale of consigned rugs after the fire, insufficient for denial of discharge. Bokara has not sustained its burden of proof to establish that Bokara rugs consigned before the fire were sold by Debtor after the fire. Bokara did establish that Debtor sold approximately $600,000 of rugs during the four and a half years after the fire, when she acquired far less than $100,000 of rugs from Bokara, her largest supplier. Debtor provided no explanation of the source of the inventory, other than to testify that Bokara was not her only supplier. Debtor vehemently denied that any Bokara rugs were salvaged. She testified that she rejected the offer of ServiceMaster to restore the water damaged rugs because of cost and lack of guarantee that the restoration would be successful. Nevertheless, the inference that rugs shipped by Bokara before the fire were sold is strong.

But assuming, without deciding, that the inference of sales outweighs Debtor's denial, there is no evidence as to how many rugs were sold and for what price. This failure destroys Bokara's ability to sustain its burden of proof as the amount of harm caused by the allegedly fraudulent sales.

14

In addition, the Court has difficulty in identifying a misrepresentation or false pretense on which Bokara relied under this theory for denial of discharge. It appears to the Court that this theory of recovery is really a claim of failure to either return consigned rugs or remit proceeds from the sale of consigned goods. It is the theory which Bokara alleged in the lawsuit filed in New York and the claim about which it negotiated with Debtor in September 2009. It was Bokara's theory of recovery before it knew of the fire at Debtor's home where the consigned rugs were sold. It is not grounds for denial of discharge.

**V. Bokara's claim against Debtor is nondischargeable under § 523(a)(2)(A) based upon her concealment of the fire and resulting damage to the consigned rugs.**

The Court finds Bokara's third theory of recovery, fraudulent concealment of the fire, sufficient for denial of discharge. Although this theory was not included in the pretrial order, as were the first and second theories discussed above, Debtor did not object when during closing arguments Bokara added this third theory of recovery.

At the time of the May 2, 2008 fire, Debtor was in possession of Bokara's property under the terms of the Consignment Agreement. That agreement established a consignment arrangement which involved the delivery of rugs to Debtor for the purpose of finding a buyer, whereby title to or ownership of the consigned rugs moved or passed directly from Bokara to the buyer, without ever moving to or passing through Debtor.[28] Under the common law, Debtor had a duty to promptly inform Bokara when Bokara's

---

[28] 32 Am.Jur.2d *Factors and Commission Merchants* § 1, available on Westlaw at 32 Am.Jur.2d Factors and Commission Merchants § 1 (data base updated August 2013).

15

property was damaged by the fire. It is the duty of a consignee to give the consignor "all necessary and useful information relating to the consignment."[29] Stated more precisely, "[i]t is the duty of the [consignee] to inform the [consignor] of all facts or circumstances, relating to the consignment, which may make it necessary for the consignor to take measures for the protection of his or her interests."[30] The security agreement required Debtor to give notice of damage to the collateral.

The Tenth Circuit held in *Young* that when a debtor has a duty to disclose information to its creditor, failure to disclose the information is a false representation or a false pretense for purposes of § 523(a)(2)(A). In that case, the debtor was a lawyer who entered into a business relationship with his client, resulting in a promissory note which the client sought to have determined nondischargeable. With respect to the element of § 523(a)(2)(A) that the debtor made a false representation, the Circuit held that there were two "false representations or false pretenses - (1) debtor's failure to make disclosures required of attorneys entering into business transactions with clients by the applicable rules of professional conduct; and (2) failure to disclose potential conflicts of interest[31]. In this case, Debtor had a duty to disclose to Bokara the damage by fire to the consigned

---

[29] *Id.* at § 10; *see Holzer v. Tonka Bay Yachts and Marine Sales, Inc.*, 386 N.W.2d 285, 287-88 (Minn. App. 1986) ("A consignee, also known as a factor, is bound to exercise the utmost good faith and loyalty to his principal, the consignor. A consignee must therefore provide his principal with all necessary and useful information relating to the consignment and has a duty to account to the consignor within a reasonable time or upon a reasonable demand.").

[30] 35 C.J.S. Factors § 34, available on Westlaw at 35 C.J.S. Factors § 34 (data base updated September 2013).

[31] *In re Young*, 91 F.3d at 1374-1375.

16

Case 13-06004   Doc# 32   Filed 11/21/13   Page 16 of 19

rugs. At most she disclosed a fire in her home, in a manner which did not convey to Bokara that there was damage to Bokara's property. Debtor's failure to promptly disclose the fire damage was a false pretense under § 523(a)(2)(A).

The circumstantial evidence convinces the Court that Debtor's failure to disclose was made with intent to deceive Bokara. The failure lasted for over four years - from the date of the fire in May 2008 to very recently, which the Court understands to be during or shortly before the commencement of Debtor's bankruptcy proceedings. Notice was not given immediately after the fire. Even in September 2009, after suit had been filed against Debtor in the New York courts for payment for the consigned goods which had not been returned, Bokara was not informed of the fire or damage to the inventory during the negotiations to suspend the litigation and resume consignment shipments. Yet, according to Debtor's testimony, the fire was the reason rugs were not returned or sold; in other words, the reason for the outstanding balance due. It would stretch common sense to find that the continued concealment of the event central to Debtor's inability to honor her commitments to Bokara was anything other than intentional.

There is no doubt that Bokara relied upon the absence of knowledge of the fire. It did not make a claim under its own $10 million insurance policy. It made a consignment shipment to Debtor on June 13, 2008, less than one month after the fire. It negotiated a plan for payment of the balance for the unsold consignment rugs in September 2009 and made two small consignment shipments thereafter. Mr. Soleimani testified that Bokara

17

would not have made the shipments or agreed to the payment plan if Bokara had known that Debtor did not have the previously shipped inventory available for sale.

Bokara's reliance was reasonable. A reasonable consignor would assume that a consignee would inform it of damage to consigned goods. Bokara did not know that Debtor operated her business out of her home, so it was reasonable for Bokara to assume that its property was in tact, even with notice to Bokara that Debtor's residence was destroyed.

Finally, the concealment of fire caused Bokara's loss of $64,461.27.[32] Because of the concealment, Bokara was deprived of the opportunity to examine the damage soon after the fire, to identify the Bokara rugs that were involved, to determine if the rugs were salvageable, and to present a claim to Bokara's insurance carrier. Because of the concealment, Bokara made consignment shipments to Debtor on June 13, 2008, September 25, 2009, and September 30, 2009. The balance due for these shipments is $24,406.42, which amount is included in the $64,461.27 claim. Because of the concealment, Bokara negotiated a payment plan with Debtor (which she did not honor) and delayed pursuing its litigation to collect the amounts owed as of May 2008, $40,054.84 of which is included in Bokara's $64,461.27 claim.

---

[32] As previously stated, Debtor stipulated that Bokara's cliam is $64,461.27.

**CONCLUSION.**

The Court therefore determines that Bokara's claim against Debtor for $64,461.27 should be excepted from discharge under § 523(a)(2)(A) based upon Debtor's deceptive concealment for approximately four and a half years of the fire damage to Bokara's rugs which were consigned to Debtor. The Court finds that Bokara's alternative theories of recovery, based upon Debtor's failure to insure the consigned rugs and Debtor's alleged sale of rug inventory which she claims was damaged in the fire, are denied. Bokara did not meet its burden of proof to establish the elements for exception from discharge under § 523(a)(2)(A) with these theories.

The foregoing constitute Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure which makes Rule 52(a) of the Federal Rules of Civil Procedure applicable to this proceeding. A judgment based upon this ruling will be entered on a separate document as required by Federal Rule of Bankruptcy Procedure 7058 which makes Federal Rule of Civil Procedure 58 applicable to this proceeding.

**IT IS SO ORDERED.**

###